**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 1:26-cv-21266-KMW**

RYAN DELL and JIRANDY LAHITTE, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

PARKING REVENUE RECOVERY SERVICES, INC., and ASURA TECHNOLOGIES USA, INC.,

Defendants.

_______________________________________________/

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS**

Plaintiffs, Ryan Dell and Jirandy Lahitte ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through undersigned counsel, file this Response in Opposition to Defendants Parking Revenue Recovery Services, Inc. ("PRRS") and Asura Technologies USA, Inc.'s ("Asura") Motion to Compel Arbitration and Stay Proceedings (D.E. 10) (the "Motion"), and respectfully state as follows:

## INTRODUCTION

This motion should be denied because PRRS cannot meet its threshold burden to show that either Plaintiff agreed to arbitrate anything. PRRS is trying to turn posted parking signs into a binding arbitration agreement, even though the alleged terms were not presented in a way that gave a reasonable driver fair notice or a real chance to review them before PRRS says assent occurred "by parking." That is not contract formation.

As to Lahitte, PRRS's theory rests on a sign posted at the entrance of a narrow garage, on the passenger-side wall and outside a driver's natural line of sight, at the very moment a driver must focus on entering safely. As to Dell, PRRS relies on close-up photos of sign text without showing that the alleged arbitration terms were actually presented to drivers in a conspicuous, reviewable way before parking. On this record, PRRS cannot show reasonable notice, assent, or a meeting of the minds as to either Plaintiff.

The motion also fails on separate grounds. As to Lahitte, PRRS cannot establish a valid arbitration agreement because its supposed "Facility Use Contract" lacks consideration, and the

arbitration clause it drafted is one-sided and lacks the mutuality Florida law requires where no separate consideration exists. The clause also fails for indefiniteness. PRRS's bare reference to "binding arbitration" does not say how arbitration is supposed to work, and Florida law does not enforce an agreement that leaves those basic terms unstated. PRRS cannot fix that problem by pointing to off-sign terms that were never properly incorporated and, during the relevant period, could be reached only through a dead QR link.

Even if PRRS could get past those formation problems, the arbitration provision still fails because it is unconscionable. PRRS claims to impose arbitration by conduct, without any meaningful opportunity to review, reject, or negotiate the term before giving up the right to proceed in court, while preserving PRRS's own enforcement and collection path. Asura cannot compel arbitration in any event because it is a nonsignatory, and Plaintiffs' statutory claims do not depend on any alleged contract with PRRS. For all of these reasons, the Motion should be denied.

## LEGAL STANDARD

The Federal Arbitration Act reflects the "fundamental principle that arbitration is a matter of contract," and courts must place arbitration agreements on the same footing as other contracts. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011); 9 U.S.C. § 2. But whether the parties formed an agreement to arbitrate in the first instance is for the Court to decide, and no presumption in favor of arbitrability applies to that threshold formation question. *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68-70 (2010); *Valiente v. Nexgen Global, LLC*, 2023 WL 6213583, at *8 (S.D. Fla. Sept. 25, 2023); *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016). The party seeking to compel arbitration bears the burden to show agreement, and the Court applies a summary-judgment-like standard, giving the party resisting arbitration the benefit of reasonable doubts and inferences. *Bazemore*, 827 F.3d at 1332-33; *Magnolia Cap. Advisors, Inc. v. Bear Stearns & Co.*, 272 F. App'x 782, 786 (11th Cir. 2008).

## ARGUMENT

### I. PRRS Cannot Carry Its Burden To Show That Either Plaintiff Assented To Arbitration

#### A. PRRS cannot show that Lahitte had reasonable notice of any arbitration offer before the conduct PRRS claims constituted acceptance

The Court should deny PRRS's motion because it cannot establish that Plaintiff Lahitte had reasonable notice of, or assented to, the terms PRRS purports to enforce. Under Florida law, "[m]utual assent [is] the touchstone of contract formation." *Eglin Fed. Credit Union v. Baird*, 400

So. 3d 643, 647 (Fla. 1st DCA 2024). Mutual assent "cannot exist where a party does not have reasonable notice that an offer is at hand" because "reasonable notice of an offer is a necessary precondition to mutual assent." *Id.* "Thus, to create a contract and trigger contractual obligations, the parties must have a definite and distinct understanding, without which there is no assent and no contract." *Glosser v. Vasquez*, 898 So. 2d 1179, 1181 (Fla. 3d DCA 2005). In other words, an "offeree cannot actually assent to an offer unless the offeree knows of its existence." *Eglin*, 400 So. 3d at 646 (citation and quotation omitted).

In determining whether a consumer received reasonable notice of an adhesion offer such as a parking sign, courts consider "the conspicuousness and clarity" of the alleged notice. *Hallman v. Carnival Cruise Lines, Inc.*, 459 So. 2d 378, 380 (Fla. 3d DCA 1984); *Eglin*, 400 So. 3d at 647 (explaining that "the design and content of the relevant interface are especially relevant").

***i. The placement of PRRS's sign on the passenger-side wall at the garage entrance defeats reasonable notice***

PRRS cannot establish contract formation with Plaintiff Lahitte because it cannot show he had reasonable notice that its contractual offer was "at hand" when he entered the garage. As depicted below, PRRS's alleged arbitration "offer" is posted on the passenger-side wall at the immediate threshold of the parking garage entrance—exactly where the public sidewalk meets the sloped driveway into the garage. The sign is mounted on the outside corner of the entrance structure, adjacent to the pedestrian path, with no pull-off area and no safe shoulder where a driver could stop without blocking the entrance or impeding the sidewalk. *See* Garabedian Decl.



That placement defeats reasonable notice. A reasonable driver approaching this entrance must focus forward to navigate the entrance safely and align the vehicle with the narrow opening, avoid pedestrians who may be using the sidewalk, and watch for cross-traffic and other vehicles entering or exiting. The environment in front of the garage makes that need for vigilance even greater: the fenced area immediately alongside the entrance is a gated perimeter fence for an

adjacent preschool, making it especially likely that young children and other pedestrians may be present on or near the sidewalk, and making any stop at the entrance far more hazardous. Nothing about this layout places a reasonable driver on notice that a contractual "offer"—let alone one containing a sweeping arbitration provision—is posted off to the passenger side at the precise moment the driver must prioritize safety and vehicle control. *See Eglin*, 400 So. 3d at 647 (mutual assent cannot exist without reasonable notice of the offer).

The absence of any driver-facing cue to stop and review terms before entry highlights the lack of reasonable notice. "As master of [the] offer, [PRRS] was free to invite acceptance by specified conduct." *Dye v. Tamko Bldg. Prods., Inc.*, 908 F.3d 675, 684 (11th Cir. 2018). Under the terms of PRRS's own purported offer, drivers are told to "[r]ead these terms PRIOR to parking," and PRRS claims assent occurs by "entering and parking." D.E. 10-1 at 1–2. PRRS therefore chose a formation mechanism that depends on conspicuous, pre-entry presentation of the terms that allows drivers a reasonable opportunity to read and consider the purported offer before entry. But PRRS did not provide that opportunity here. The alleged contract is posted on the passenger-side wall, outside a driver's ordinary line of sight, at the precise moment a driver has the least ability to safely search for and read legal text. Consistent with that layout, Plaintiff Lahitte attests he did not see any sign he understood to be a legal contract or an agreement to arbitrate when he entered the garage. Lahitte Decl. ¶¶ 6–8.

The notice problem is compounded by the practical reality that a reasonable driver cannot read this sign from the roadway while safely operating a vehicle. Florida's statutes require that a parking operator "place signage that is **legible and clearly visible** to persons entering the area used for motor vehicle parking." Fla. Stat. § 715.075(1)(a) (emphasis added).[1] Yet PRRS's placement here is the opposite of "clearly visible" to a person entering the garage: the sign is positioned such that a driver would have to divert their attention at the precise moment the driver must focus on safely clearing the sidewalk area, watching for pedestrians, and navigating into the garage. And even if the sign were "clearly visible" (which it is not), the only way a driver could read and consider PRRS's purported "offer" and contractual terms at this location would be to pull onto or stop across the sidewalk area at the entrance—conduct Florida law expressly prohibits, as Florida's statutes make it unlawful to "[s]top, stand, or park a vehicle … [o]n a sidewalk." Fla.

[1] The signage also must list the rates for rule violations and provide notice of the statutory grace period and appeal process. *Id.*

Stat. § 316.1945(1)(a)2.

In effect, PRRS asks this Court to ratify a contracting-while-driving-theory. But Florida's driver-safety guidance warns that "distracted driving" is "extremely risky behavior" that puts others at risk, and identifies three core categories of distraction: (1) "Visual—taking your eyes off the road"; (2) "Manual—taking your hands off the steering wheel"; and (3) "Cognitive—thinking about anything other than driving." *See* Ex. A, Fla. Dep't of Highway Safety & Motor Vehicles, *The Official Florida Driver License Handbook* 34 (rev. 08/2023), at 34. PRRS's theory implicates all three. To notice and accept PRRS's purported terms at this entrance, a driver would have to (1) take their eyes off the road to visually search the passenger-side wall for dense legal text; (2) take their hands off the steering wheel to manually use a phone to scan two QR codes on PRRS's sign; and (3) think about lengthy and consequential contract terms—including a waiver of the right to sue in court—while simultaneously steering through a narrow entrance and monitoring pedestrians and traffic.

In sum, PRRS chose the worst possible moment and location to present its purported "offer" by placing its sign on the passenger-side wall at the very threshold of a narrow parking garage entrance, adjacent to an active sidewalk and cross-traffic, where a reasonable driver must focus on entering the garage safely. PRRS therefore cannot show that a reasonable driver had reasonable notice of its purported offer on the passenger-side wall.

***ii. PRRS's other signs do not provide reasonable pre-parking notice or an opportunity for review***

The additional signs PRRS identifies do not cure this fatal flaw. ***First***, as to the signs at the garage exit[2], those exit signs cannot provide notice of terms allegedly accepted upon "entering and parking," because a driver has no reason to encounter (or read) exit signage when deciding whether to ***enter*** and park in the garage.

***Second***, the attendant booth-area sign,[3] mounted on the exit-side of a non-operational booth, is not reasonably visible to or readable by a driver entering the garage. As the photograph below shows from inside a vehicle at a typical approach distance, a driver's attention is naturally

---

[2] Two of the signs PRRS relies on are exit-facing, including one on the garage-exit wall and one on the back of the non-operational booth (discussed *infra*), visible only when a driver is inside the garage looking outward toward the exit.

[3] PRRS's photograph predates the incident and does not reflect the booth layout during the relevant period. The photograph above is representative of that layout.

drawn to the large, driver-facing blue sign listing rates and hours of operation (the "Rates Sign").




*See* Garabedian Decl. From that vantage point, the PRRS sign is almost entirely obstructed by the Rates Sign, and PRRS's purported arbitration language is wholly hidden from a driver's line of sight. PRRS easily could have placed its purported contract sign in the same driver-facing location as the Rates Sign (or immediately adjacent to it), where it would actually be presented to motorists as they approach and enter the garage. Instead, however, PRRS placed its sign behind the conspicuous Rates Sign and on a side-facing surface that is not oriented toward an approaching driver's line of sight.

PRRS's failure to position the booth-area sign in any conspicuous manner is dispositive because PRRS does not post its purported contractual terms throughout the facility and instead relies on the passenger-side wall sign and the booth-area sign for notice and assent. Those are therefore the only purported opportunities for a motorist to review PRRS's alleged "offer" before proceeding into the garage and parking.

Even if a driver could glimpse part of the booth-area sign while approaching, that still would not create a reasonable opportunity to review dense legal terms while safely navigating the entrance. Because PRRS posted no additional signs inside the garage presenting its purported terms, and because the garage layout funnels vehicles upward toward the attached office building (with guest parking located only on the sixth floor), any review would have to occur right there at the entrance threshold. That would require a driver to stop at the threshold, exit the vehicle, and walk to the booth area to read the sign (because the sign is not legible from a reasonable driver's vantage point)—all while obstructing the entrance lane and impeding traffic in violation of Florida law. *See* Fla. Stat. § 316.1945(1)(b)1 (making it unlawful "[s]tand or park a vehicle, . . . [i]n front

of a public or private driveway"). Under these conditions, PRRS cannot show that a reasonable driver had a meaningful opportunity to review and assent to arbitration terms before PRRS contends acceptance occurred by "entering and parking."

***iii. Tobey and Butler do not support arbitration on this record***

PRRS's reliance on *Tobey* and *Butler* is misplaced. *See Tobey v. Ace Parking Mgmt., Inc.*, No. 3:24-CV-2932-X, 2025 WL 1919887, at *3 (N.D. Tex. July 11, 2025); *Butler et al v. Asura et al*, Case No. 24-cv-529 (D. Colo.). Those cases did not address the timing and formation defect presented here: PRRS's own sign tells drivers to review the terms before the conduct PRRS claims constitutes acceptance, yet PRRS's placement and sequencing of signage make meaningful pre-entry review unreasonable, if not impossible.

The facts were also materially different. In *Tobey*, the court found reasonable notice because the plaintiff admitted he paid at the kiosk and submitted a photo showing a bright red arbitration sticker placed directly in the center of that kiosk. *Tobey*, 2025 WL 1919887, at *3. In *Butler*, the court found reasonable notice in a wide-open surface lot where PRRS posted signs throughout the premises, giving drivers repeated opportunities to encounter the terms under conditions that allowed them to stop, park, and review them. Below are photos from the *Tobey* court's decision showing the posted sign on the kiosks:







The photographs below, attached as exhibits to PRRS's motion in *Butler*, show how PRRS's signs were displayed throughout the parking lot, at both the entrance and the parking area.









This case is the opposite. The Miami Garage is not saturated with PRRS signage. In fact, there is not ***a single*** PRRS sign anywhere inside the parking area of the garage, on the parking levels, along the pedestrian routes, at the payment points, or at the entrances from the garage into the attached building. After entry, the only signs posted throughout the garage, shown below, are white QR-code instruction signs that tell drivers only how to pay (*See* Garabedian Decl.):







These signs do not identify PRRS, mention arbitration, direct anyone to additional terms, or warn that parking or payment is purportedly waiving the right to sue in court. They simply provide payment instructions: "1. Scan QR code above 2. Select amount of time 3. Enter license plate # 4. Add credit card." PRRS could have posted arbitration signs throughout the facility, as in *Butler*, or placed conspicuous arbitration language on the payment mechanism, as in *Tobey*. It did neither here.

Those differences matter because the garage is integrated with an attached destination building. Visitors can park and enter the building directly from inside the garage, without ever

returning to the entrance area where PRRS claims its "offer" was posted. That is exactly what happened here: Lahitte parked on the sixth floor and proceeded directly into the building.

In short, PRRS's theory depends on arbitration signage that had to be noticed, read, and accepted while a driver was actively navigating a narrow garage entrance. That is nothing like *Tobey*, where the notice appeared on the kiosk the plaintiff used to pay, or *Butler*, where PRRS posted signs throughout a wide-open lot. Those cases are therefore inapposite.

**B. PRRS likewise cannot show that Dell had reasonable notice of, or assented to, any arbitration agreement**

PRRS likewise fails to carry its burden to show that Plaintiff Dell assented to arbitration. At the outset, PRRS's evidentiary showing does not establish reasonable notice because it relies on close-up photographs of sign text divorced from the only question that matters for formation: whether the signage was placed in locations a reasonable motorist *could not miss* when entering and parking. While the close-up images may show what the signs say, they do not show *where* the signs were positioned in the lot, whether they were driver-facing, whether they were visible from the approach path, or whether vehicles would pass within a readable distance of the signs. PRRS therefore cannot carry its burden to show that its alleged terms were conspicuously presented to a driver in a manner sufficient to create reasonable notice of an "offer … at hand." See *Eglin*, 400 So. 3d at 647.

That deficiency is dispositive here given PRRS's own acceptance theory. PRRS's San Antonio sign states that drivers agree to arbitration "[b]y parking on this Facility." But that theory requires PRRS to show that the arbitration terms were presented in a way that allowed a reasonable motorist to review them before parking—the conduct that PRRS deems to be acceptance. Because PRRS does not and cannot show that its purported offer was reviewable before parking, PRRS cannot show reasonable notice or assent as to Plaintiff Dell.

**II. <u>Even Apart From Assent, PRRS Cannot Prove A Valid And Enforceable Arbitration Agreement With Lahitte Because Its Purported "Facility Use Contract" Lacks Consideration And Mutuality</u>**

PRRS cannot compel arbitration because it has not carried its threshold burden to show that any enforceable arbitration agreement exists between PRRS and Lahitte. The Supreme Court has made clear that the "threshold question of whether an arbitration agreement exists at all is 'simply a matter of contract.'" *Bazemore*, 827 F.3d at 1329 (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)). Although the FAA supplies the enforcement framework, state

law governs contract formation and interpretation. *Emps. Ins. of Wausau v. Bright Metal Specialties, Inc.*, 251 F.3d 1316, 1322 (11th Cir. 2001).

Under Florida law, a valid contract requires "(1) offer; (2) acceptance; (3) consideration; and (4) sufficient specification of the essential terms." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (citation omitted). And while federal policy may resolve doubts about the scope of a valid arbitration clause, that presumption "does not apply to disputes concerning whether an agreement to arbitrate has been made." *Bazemore*, 827 F.3d at 1329 (quoting *Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1115–16 (11th Cir. 2014)); *see also Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 301 (2010).

PRRS fails to establish formation for two reasons.

*First*, the purported "Facility Use Contract" lacks consideration flowing from PRRS to Lahitte. As the sign presents the transaction, PRRS is a third-party enforcement vendor, not the entity granting the parking privilege or providing any bargained-for benefit.

*Second*, the arbitration language is not mutual. Where, as here, there is no other consideration, Florida requires that "mutual provisions must be binding on both parties." *LaBonte Precision, Inc. v. LPI Indus. Corp.*, 507 So. 2d 1202, 1203 (Fla. 4th DCA 1987).

**A. PRRS's purported "Facility Use Contract" fails for lack of consideration**

PRRS bears the burden to prove a valid contract supported by consideration between PRRS and Lahitte. *Compere v. Nusret Miami, LLC*, 396 F. Supp. 3d 1194, 1200 (S.D. Fla. Aug. 20, 2019). On this record, it cannot. The sign depicts PRRS as a third-party enforcement vendor, not the party conferring the parking privilege or giving up any lawful enforcement right in exchange for the parker's promises.

PRRS tries to supply consideration by invoking the generic implied-parking-contract exchange described in *Butler*: a driver is allowed to park and, in return, agrees to pay and comply with posted rules (or face enforcement). D.E. 10 at 11, quoting *Butler*, D.E. 33. PRRS points to the on-site "Facility Use Contract," including the $120 "Non-Compliance fee" and the reference to towing or booting, as the terms of that exchange. (D.E. 10-1.) But that theory presupposes that the contracting counterparty is the entity granting parking access and holding the enforcement rights being exchanged. This sign does not describe PRRS that way.

Instead, the sign identifies PRRS only as the entity that "strictly enforce[s]" the facility's rules, assesses "Non-Compliance" fees, and routes unpaid assessments to collection. *Id.* It does

not state that PRRS offers parking, sets the parking price, or grants permission to park. On the sign's own terms, PRRS is the collector and enforcer, not the provider.[4] At most, any implied parking contract based on access and payment would run between the parker and the facility's owner or operator. PRRS therefore must identify separate consideration flowing from PRRS to Lahitte for PRRS's purported standalone "Facility Use Contract." It cannot.

PRRS may try to fill that gap with the "forbearance" theory embraced in *Tobey*. Applying Texas law, *Tobey* found consideration because PRRS purportedly "may boot or tow a vehicle," but "forbears such removal in exchange for following the rules of the lot." *Id.* at *2. But under Florida law, which applies to formation with Lahitte, forbearance supplies consideration only where the allegedly forbearing party has a bona fide belief that it holds a viable legal right and gives up pursuit of that right. *Citibank Int'l v. Mercogliano*, 574 So. 2d 1190, 1191 (Fla. 3d DCA 1991); *Wicker v. Bd. of Pub. Instruction of Dade Cnty.*, 106 So. 2d 550, 554 (Fla. 1958). The threshold question, then, is whether PRRS actually possessed a viable, lawful tow or boot remedy at this facility that it could plausibly bargain away. It did not.

Florida law does not treat towing and immobilization as open-ended private "rights." They are regulated remedies that exist only when statutory and ordinance predicates are satisfied. Fla. Stat. § 715.07(2)(a). On this record, PRRS cannot show those predicates were met. It therefore cannot claim it "forbore" a lawful remedy as consideration.

***Towing.*** Florida permits nonconsensual towing from private property only if the statutory notice prerequisites are satisfied. Fla. Stat. § 715.07(2)(a), (9). At a minimum, the statute requires a compliant "tow-away zone" notice before towing, with specific content and placement requirements, including the required "TOW-AWAY ZONE" language and towing-company identification. *Id.* § 715.07(2)(a)5. The record shows no such compliant tow-away signage. The only sign that even references towing is PRRS's conditional statement that vehicles "may be subject to towing or booting, to the extent permitted by law," which omits the required tow-away warnings and towing-company identification. (D.E. 10-1.) On these facts, PRRS cannot treat towing as a concrete, lawful remedy it possessed and bargained away as "forbearance."

***Booting.*** Miami-Dade County separately regulates vehicle immobilization and makes

[4] PRRS is positioned like a venue's bouncer. The patron pays the venue for entry. The bouncer enforces the venue's house rules and imposes consequences for violations. But the bouncer is not the counterparty providing the service the patron is purchasing.

booting unlawful on private property without the owner or driver's consent unless the County's notice-and-disclosure predicates are satisfied.[5] Miami-Dade County, Fla., Code of Ordinances § 30-479. The ordinance requires prominent on-site notice using the mandated "IMMOBILIZATION/TOW AWAY ZONE" language and specified disclosures, including the immobilization provider's identity, hours, fees, and contact and complaint information. *Id.* § 30-479(1)(a)-(g). It also prohibits any immobilization charge unless those requirements are met and requires reimbursement of unlawful charges. *Id.* § 30-479(8).

Here, the record contains no "IMMOBILIZATION/TOW AWAY ZONE" notice at the Facility. PRRS's sign is not such a notice and omits the County-mandated disclosures. *Id.* § 30-479(1)(a)-(g). PRRS therefore cannot claim it possessed a lawful immobilization remedy that it bargained away as consideration.

In sum, PRRS cannot establish consideration for a standalone "Facility Use Contract" between PRRS and Lahitte. The sign depicts PRRS as a third-party enforcement vendor, not the provider of parking. And the "forbearance" theory that drove *Tobey* does not supply consideration here because, under Florida law, towing and immobilization are regulated remedies contingent on statutory and ordinance predicates that are not shown to have been satisfied at this Facility. Fla. Stat. § 715.07(2)(a); Miami-Dade County, Fla., Code of Ordinances § 30-479. Without consideration, the purported "Facility Use Contract" fails, and the arbitration clause falls with it.

**B. The arbitration provision is one-sided and lacks the mutuality Florida law requires**

Because PRRS cannot identify any separate consideration flowing from PRRS to Lahitte for this supposed "Facility Use Contract," Florida law requires mutuality in the arbitration obligation. *See LaBonte Precision*, 507 So. 2d at 1203 (explaining that where there is no other consideration for a contract, "mutual provisions must be binding on both parties," but where there is other consideration, mutuality of obligation is not essential). PRRS cannot meet that requirement because the clause it drafted binds only the parker.

Arbitration is a matter of contract, so ordinary contract interpretation controls. *Seifert v. U.S. Home Corp.*, 750 So. 2d 633, 636 (Fla. 1999). Where the language is clear, courts enforce it as written, not as one side later wishes it had been written. *St. Paul Fire & Marine Ins. Co. v. Luke*

[5] Section 30-478 does not change the analysis because the City of South Miami, where the Miami Garage is located, has no separate immobilization ordinance.

*Ready Air, LLC*, 880 F. Supp. 2d 1299, 1307 (S.D. Fla. Aug. 1, 2012); *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000). And an arbitration clause must be read in context with the agreement as a whole. *BKD Twenty-One Mgmt. Co., Inc. v. Delsordo*, 127 So. 3d 527, 530 (Fla. 4th DCA 2012).

Here, the arbitration sentence is framed as a one-way undertaking by the customer:

> By parking on this Facility, **you** hereby agree that the sole remedy for all unresolved disputes is binding arbitration, and specifically waive the right to a jury trial, class action and/or class arbitration.

D.E. 10-1 (emphasis added).

The clause imposes obligations on "you" (the parker). It does not say PRRS "agrees," "will," or "shall" arbitrate anything. *See Calderon v. Sixt Rent A Car, LLC*, 2012 WL 700381, at *9 (S.D. Fla. Feb. 12, 2020) (explaining, in context, that "the second-person pronoun 'you' clearly refers to the customer"). It contains no reciprocal commitment requiring PRRS to arbitrate its own claims, and no waiver by PRRS of its right to proceed in court. The problem is not the absence of "magic words." The problem is that PRRS drafted a clause that captures only the parker's assent and waivers, while remaining silent as to any corresponding undertaking by PRRS.

That reading is reinforced by the sign as a whole. The "Facility Use Contract" repeatedly addresses the parker in the second person ("YOU MUST COMPLY," "you accept," "you agree," "you grant permission and consent") while describing PRRS in the third person as the compliance enforcer and decisionmaker. (D.E. 10-1.) When the sign describes PRRS's own actions, it uses clear affirmative language, such as "PRRS will provide a decision within 5 business days." *Id.* And the sign preserves PRRS's preferred enforcement path by stating that "[u]npaid fees assessed by PRRS will be assigned for collection to a 3rd Party debt collector." *Id.* Read in context, arbitration is another condition imposed on the parker, not a bilateral exchange of promises.[6] *BKD Twenty-One*, 127 So. 3d at 530.

PRRS's own drafting practices underscore the point. PRRS maintains separate "Terms & Conditions" on its website that include an arbitration clause written in expressly bilateral terms, repeatedly stating that "*the parties* agree" to arbitrate and describing mutual procedures (for example, an arbitration service "selected by *the parties*" and a location "mutually agreed upon by

[6] The sign's "DISPUTE PROCESS" section likewise runs one way: the parker disputes, PRRS decides, and the parker may appeal. (D.E. 10-1.) That structure is consistent with a remedy imposed on the parker, not a mutual commitment binding PRRS.

*the parties*").[7] The contrast is not offered to import those online terms here.[8] It is offered to show that PRRS made a deliberate drafting choice on the sign. When it wanted bilateral obligations, it used bilateral language. Here, it did not.

PRRS may argue, citing *Tobey*, that the phrase "sole remedy for all unresolved disputes" necessarily implies mutuality. It does not. That phrase addresses the scope of disputes covered, not who is promising to arbitrate. The sentence is still directed only to "you," and converting "you hereby agree" into a bilateral obligation would require rewriting the contract into "the parties agree" or "you and PRRS agree," language PRRS chose to use in its online Terms & Conditions but did not use in its Facility Use Contract. Courts enforce contracts as written, not as revised after the fact. *Auto-Owners*, 756 So. 2d at 34.

Nor does *Tobey* change the analysis. *Tobey* applied Texas law and proceeded on a different record and analytical sequence, including a finding of separate consideration based on PRRS's asserted forbearance from towing or booting. *Tobey*, 2025 WL 1919887 at *2. On that basis, the court rejected a mutuality challenge under Texas law, reasoning that the parker's reading would improperly read "all" out of the clause. *Id.* Here, by contrast, Florida law makes mutuality dispositive when there is no other consideration, and the question is whether PRRS actually bound itself through the words it chose: a second-person clause capturing only the parker's assent and waivers ("you hereby agree," "waive the right"), with no corresponding statement that PRRS "agrees," "will," or "shall" arbitrate. On this record, *Tobey* does not resolve the formation problem.

At minimum, if PRRS claims the clause can be read as binding PRRS despite its one-sided, second-person drafting, that is a PRRS-created ambiguity, which must be construed against PRRS as drafter. *Umbach v. Mercator Momentum Fund, L.P.*, 2007 WL 2915910, at *3 (S.D. Fla. Oct. 5, 2007) (construing ambiguous arbitration language against the drafter); *BKD Twenty-One*, 127 So. 3d at 530 ("Contractual language is ambiguous only if it is susceptible to more than one *reasonable* interpretation.") (emphasis in original). And PRRS cannot invoke a pro-arbitration presumption to manufacture mutuality that the text does not supply, because that presumption does not apply to the threshold question whether an agreement to arbitrate was made in the first place. *Bazemore*, 827 F.3d at 1329; *Granite Rock Co.*, 561 U.S. at 301.

[7] https://parkingprrs.com/terms-conditions (last accessed March 4, 2026) (emphasis added).

[8] Nor do Defendants cite or seek to enforce the arbitration provision in the Terms & Conditions, which is not cited in their motion.

For this independent reason, PRRS has not carried its burden to prove a valid, enforceable arbitration agreement with Lahitte, and the Court should deny the motion to compel arbitration as to Lahitte.

## III. Even If PRRS Could Show Contract Formation, Its Purported Arbitration Clause Is Too Indefinite To Enforce

Even if PRRS could establish reasonable notice of its purported arbitration agreement (it cannot), its motion still independently fails because PRRS cannot prove the existence of a valid, enforceable agreement to arbitrate. Its purported arbitration clause is indefinite under basic Florida contract law.

Florida law "governs whether an enforceable contract or agreement to arbitrate exists." *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016). For a binding arbitration to exist under Florida law, the terms of an arbitration agreement "must be definite enough so that the parties at least have some idea as to what particular matters are to be submitted to arbitration and *set forth some procedures by which arbitration is to be effected.*" *Spicer v. Tenet Fla. Physician Servs., LLC*, 149 So. 3d 163, 165–66 (Fla. 4th DCA 2014) (emphasis in original). Absent agreement on sufficiently definite terms, no enforceable arbitration agreement is formed. *Id.*; *see also Suggs v. Defranco's, Inc.*, 626 So. 2d 1100, 1101 (Fla. 1st DCA 1993) ("Where essential terms of an agreement remain open . . . there can be no enforceable contract.").

### A. The sign's bare reference to "binding arbitration" is too indefinite to create an enforceable agreement

*Spicer* is dispositive in this case. There, an employment agreement stated—almost exactly like PRRS's sign—that any disputes "shall be submitted to final and binding arbitration." *Spicer*, 149 So. 3d at 165. The court held that language failed to create a binding arbitration agreement because it "[did] not set forth any procedures for arbitration" as required by Florida law. The court further held that because the "agreement . . . has no statement that it is to be construed under Florida law," the Florida Arbitration Code could not be used to "fill[] in the 'gaps' or missing procedure." *Id.*

Here, PRRS's purported arbitration agreement suffers from the same fatal defect as the one in *Spicer* because it merely states the "sole remedy" for unresolved disputes is "binding arbitration," without providing any applicable procedures. Indeed, it provides no mechanism to effect arbitration, no arbitral forum, no incorporation of arbitration rules, no method for selecting an arbitrator, no process for initiating arbitration, and no procedure for the allocation of fees or

costs. In short, PRRS's supposed arbitration agreement purports to mandate arbitration while leaving the parties without a single "*procedure[] by which arbitration is to be effected.*" *Spicer*, 149 So. 3d at 165–66 (emphasis in original). Under Florida law, such absence of definite terms precludes the formation of an enforceable arbitration agreement. *Id.* ("We conclude that the employment agreement, standing alone, did not contain a legally sufficient arbitration agreement because it failed to set forth some procedures by which arbitration was to be effected.").

**B. PRRS cannot cure that indefiniteness through off-sign terms that were never accessible or incorporated**

PRRS may argue that the QR codes on its signs, which may purport to link users to more comprehensive terms and arbitration procedures, saves its otherwise defective arbitration clause. It does not because PRRS's QR codes did not function during the relevant period. During the relevant time period, the Terms and Conditions QR code links on each of PRRS's signs led to the following URL: https://prrsparking.com/termsandcond. But that URL was nonoperative during the relevant time and resolved only to an error page (shown below), stating "404 page not found."




*See* Garabedian Decl. In other words, the QR codes were not a functioning gateway to any comprehensive terms or arbitration rules or procedures—the QR codes were dead links. Because PRRS's sole purported mechanism for presenting its off-sign Terms and Conditions was nonfunctional, those web-based terms were not incorporated into any alleged agreement formed at the time of parking.[9] *See Spicer*, 149 So. 3d at 168 (holding that a separate document referenced

[9] PRRS appears to have fixed the QR code ***after*** Plaintiffs served the Amended Complaint, and now directs "https://prrsparking.com/termsandcond" to "https://prrsparking.com/terms-conditions," which appears to

in the arbitration provision was not incorporated where it was not "attached and no location was given as to where the [collateral document] could be found").

In sum, PRRS cannot meet its burden to show the existence of any enforceable agreement to arbitrate. The PRRS signs' bare reference to "binding arbitration" is insufficiently definite to constitute an agreement to arbitrate because it fails to provide a single procedure "by which arbitration is to be effected." And PRRS cannot cure that defect by invoking any purported off-sign Terms and Conditions because the QR codes on PRRS's signs contained a dead link that led to nothing. Because no definite arbitration agreement existed at the time PRRS contends Plaintiff Lahitte assented, the Court should deny PRRS's motion to compel arbitration on this independent ground.

## IV. <u>Even If Formation Were Otherwise Shown, PRRS's Arbitration Provision Is Unconscionable And Unenforceable</u>

Even if PRRS could establish contract formation, the arbitration term still fails because it is unconscionable under Florida law. Unconscionability requires both procedural and substantive unconscionability, evaluated together under Florida's sliding-scale approach. *Dunn v. Glob. Tr. Mgmt., LLC*, 506 F. Supp. 3d 1214, 1234 (M.D. Fla. 2020), *reversed on other grounds*, 2024 WL 4379966 (11th Cir. Oct. 3, 2024). The two prongs must both be present, but they "need not be present to the same degree," and the analysis turns on bargaining power and the realities of how the term was presented. *Basulto v. Hialeah Auto.*, 141 So. 3d 1145, 1158–61 (Fla. 2014).

Procedural unconscionability asks whether the consumer had a meaningful choice at the time of assent. *Dunn*, 506 F. Supp. 3d at 1233 (quoting *Gainesville Health Care Ctr., Inc. v. Weston*, 857 So. 2d 278, 284 (Fla. 1st DCA 2003)). Substantive unconscionability focuses on whether the term itself is unreasonably one-sided or unfair. *Palm Beach Motor Cars Ltd., Inc. v. Jeffries*, 885 So. 2d 990, 992 (Fla. 4th DCA 2004). Florida courts reject arbitration clauses where both the presentation and the substance reflect overreach in a consumer adhesion setting. *Powertel, Inc. v. Bexley*, 743 So. 2d 570, 577 (Fla. 1st DCA 1999).

### A. The arbitration provision is procedurally unconscionable because PRRS claims assent by conduct without any meaningful opportunity for review or choice

Procedural unconscionability turns on whether the consumer had a meaningful choice

---

be PRRS's functioning Terms and Conditions webpage. But that after-the-fact change cannot retroactively incorporate terms that were inaccessible when Lahitte used the facility.

when the agreement was allegedly formed, considering the "circumstances surrounding the transaction." *Dunn*, 506 F. Supp. 3d at 1233. A contract of adhesion is a "strong indicator" of procedural unconscionability. *Id.* at 1234. Courts focus on how the term was presented, including whether the consumer had a fair opportunity to review it and seek clarification before being bound. *Hobby Lobby Stores, Inc. v. Cole*, 287 So. 3d 1272, 1276 (Fla. 5th DCA 2020) (court must examine circumstances; noting the employee in that case did not show he "lacked a full and fair opportunity to inquire into the agreement's terms or to enlist help if confused"). And where the consumer lacks any meaningful choice, Florida courts find procedural unconscionability. *Powertel*, 743 So. 2d at 575; *Pendergast v. Sprint Nextel Corp.*, 592 F.3d 1119, 1135 (11th Cir. 2010).

Those standards are met here. PRRS claims arbitration is accepted "by parking," through standardized signage, with no negotiation, no alternative terms, and no opt-out. That alone presents a substantial procedural problem. But the problem here is not just adhesion. PRRS's model does not require a signature, a click-through acknowledgment, or any other deliberate act showing that the consumer had a real chance to see and evaluate the waiver before being bound. Instead, PRRS claims assent arises automatically from the act of parking, even though the same sign instructs drivers to read the terms before that conduct occurs. That is not the sort of "full and fair opportunity to inquire" that defeats procedural unconscionability. *Hobby Lobby*, 287 So. 3d at 1276; *Powertel*, 743 So. 2d at 574-75.

The same facts discussed in Section I confirm there was no meaningful opportunity for either Plaintiff to review, reject, or ask about the arbitration term before PRRS claims assent occurred. As to Lahitte, PRRS relies on signage placed at the threshold of a narrow garage entrance, on the passenger-side wall and outside a driver's natural line of sight, at the very moment a driver must focus on safely entering the facility. There was no safe place to stop, no driver-facing cue directing a motorist to pause and read a legal agreement, and no repeated arbitration disclosures throughout the garage, payment points, or pedestrian routes that might reduce surprise. As to Dell, PRRS likewise relies on sign text without showing that the alleged arbitration term was presented in a conspicuous, reviewable manner before parking, and Dell was not required to sign anything or click through any arbitration disclosure during payment. On either record, PRRS's theory depends on assent by conduct without any realistic chance to understand the waiver beforehand. *Powertel*, 743 So. 2d at 575; *Pendergast*, 592 F.3d at 1135.

This is therefore not a case involving only a modest degree of procedural

unconscionability. PRRS's model claims to bind consumers at the moment of parking, without any practical opportunity to pause, review dense legal terms, seek clarification, or decline before surrendering the right to proceed in court. Under Florida's sliding-scale approach, that is substantial procedural unconscionability, especially when paired with the one-sided substance of the clause addressed next.

**B. The arbitration provision is substantively unconscionable because it is drafted to bind the customer while preserving PRRS's preferred enforcement pathway**

Substantive unconscionability "focuses on the actual agreement and whether the terms are unreasonable and unfair." *Palm Beach Motor Cars*, 885 So. 2d at 992. A central marker is lack of mutuality: "[w]here one party is bound to arbitration of its claims but the other is not, there can be substantive unconscionability." *Id.*; *see also BellSouth Mobility, LLC v. Christopher*, 819 So. 2d 171, 173 (Fla. 4th DCA 2002) (finding substantive unconscionability where "customers are bound to arbitration" while the company retained the ability to pursue court action, including debt collection, giving the drafter "an unfair advantage").

That is what PRRS drafted here. The sign frames arbitration as a one-way undertaking by the customer: "By parking on this Facility, ***you*** hereby agree that the sole remedy for all unresolved disputes is binding arbitration, and specifically waive the right to a jury trial, class action and/or class arbitration." (D.E. 10-1) (emphasis added). As addressed in the formation section, *supra*, the clause speaks only to "you" and captures only the customer's assent and waivers. It does not contain any reciprocal commitment by PRRS that it "agrees," "will," or "shall" arbitrate anything. *See Calderon*, 2012 WL 700381 at *9. The contrast with PRRS's own online terms underscores the point: when PRRS intends mutual arbitration obligations, it uses express bilateral language ("the parties agree"). Here, it did not.

Florida courts recognize this type of asymmetry as substantively oppressive in consumer settings. *See Thompson*, 2015 WL 11197762 at *3 (substantive unconscionability where arbitration is one-sided and the absence of mutual obligation on a key point reflects a "one-sided, oppressive arrangement" to which consumers without bargaining power are vulnerable); *Addit, LLC v. Hengesbach*, 341 So. 3d 362, 368 (Fla. 2d DCA 2022) (arbitration provision "plainly substantively unconscionable" where it carved out claims that could only be brought by one party).

The one-sidedness is not merely semantic. The clause forces the customer to arbitrate and waives jury and class procedures, while the sign elsewhere preserves PRRS's preferred

enforcement pathway, including assignment of "unpaid parking fees" to a third-party debt collector. (D.E. 10-1.) In practical effect, PRRS channels consumer claims out of court while keeping its collection machinery intact. That imbalance is the same "unfair advantage" *BellSouth* found unconscionable. 819 So. 2d at 173.

Taken together with the substantial procedural unconscionability shown above, these terms satisfy Florida's sliding-scale standard and confirm the arbitration term is unenforceable.

## V. Asura Cannot Invoke PRRS's Purported Arbitration Agreement

As a nonsignatory, Asura cannot invoke PRRS's alleged arbitration agreement. The Eleventh Circuit has made clear that equitable estoppel doctrine permits a nonsignatory to compel arbitration only in limited circumstances. *See Kroma Makeup EU, LLC v. Boldface Licensing + Branding, Inc.*, 845 F.3d 1351, 1354–55 (11th Cir. 2017). Specifically, "[u]nder that doctrine, a defendant who is a non-signatory to an agreement containing an arbitration clause can force arbitration of a signatory's claims when the signatory . . . **must rely on the terms of the written agreement in asserting its claims against the nonsignatory**." *Id.* (emphasis added) (citations and quotations omitted).

Asura's attempt to invoke PRRS's purported arbitration agreement fails because it cannot show that Plaintiffs' claims against Asura "rely on the terms of [a] written agreement." *Id.* Plaintiffs' claims arise from Defendants' obtainment and use of Plaintiffs' personal information—not from any alleged parking contract with PRRS. Thus, because Plaintiffs do not sue to enforce any PRRS terms, do not seek any benefit under any terms, and do not need any such terms to prove liability against Defendants, Asura cannot invoke the purported arbitration agreement under the equitable estoppel doctrine. *See Santiago v. Neno Rsch. LLC*, No. 24-13733, 2025 WL 1793306, at *2 (11th Cir. June 30, 2025) ("The district court did not err in determining that Santiago's claim against Neno does not rely on the terms of his contract with Turn. Santiago's claim against Neno is brought pursuant to the FCRA, not pursuant to the contract between Santiago and Turn. Thus, equitable estoppel based on contractual reliance does not apply.").

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion to Compel Arbitration and Stay Proceedings. Plaintiffs further request such other and further relief as the Court deems just and proper.

Dated: March 5, 2026

Respectfully submitted,

**MARK FERRER & HAYDEN**
80 S.W. 8th Street, Suite 1999
Miami, Florida 33130

By: *s/ Charles M. Garabedian*
Charles M. Garabedian, Esq.
Florida Bar No. 1000974
Victor Sanabria, Esq.
Florida Bar No. 125292
victor@mfh.law
charles@mfh.law
eservice@mfh.law

**CERTIFICATE OF SERVICE**

I hereby certify that I filed the foregoing document electronically on the Court's CM/ECF docket on March 5, 2026, which served same electronically upon all counsel of record.

By: *s/ Charles M. Garabedian*